# FOR PUBLICATION



**FILED**

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**JULIA BLACKWELL GELINAS**
**MAGGIE L. SMITH**
FROST BROWN TODD, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
TETON CORPORATION:

**RICHARD T. MULLINEAUX**
**CRYSTAL G. ROWE**
KIGHTLINGER & GRAY, LLP
New Albany, Indiana

ATTORNEYS FOR APPELLEE
INNOVATIVE ROOFING SOLUTIONS,
INC.
**SCOTT L.TYLER**
**ERIC T. EBERWINE**
WATERS, TYLER, HOFFMANN &
SCOTT, LLC
New Albany, Indiana

ATTORNEYS FOR APPELLEES
GUTAPFEL ROOFING, INC. and
DANIEL L. GUTAPFEL
**GROVER B. DAVIS**
**JAMES T. FLANIGAN**
McCLURE McCLURE & DAVIS
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

THE BOARD OF COMMISSIONERS
OF THE COUNTY OF JEFFERSON )

Appellant,

and

TETON CORPORATION, INNOVATIVE
ROOFING SOLUTIONS, INC., GUTAPFEL
ROOFING, INC. and DANIEL L. GUTAPFEL

Appellees.

No. 72A04-1302-CT-00055

**February 4, 2014**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

The Board of Commissioners of Jefferson County ("Jefferson County") appeals the Scott Circuit Court's entry of summary judgment in favor of Teton Corporation, Innovative Roofing Solutions, Inc., Gutapfel Roofing Inc., and Daniel L. Gutapfel (collectively "the Appellees"). The trial court determined that Jefferson County waived its right to subrogate damages pursuant to the terms of the American Institute of Architects Contract ("the AIA Contract") it entered into with the general contractor, Teton.

On appeal, Jefferson County raises the following dispositive issue: whether the trial court erred when it determined that the County waived its right to subrogate damages to non-Work property. We conclude that Jefferson County waived its right to subrogate any and all claims covered by its property insurance, and therefore, we affirm the trial court.

**Facts and Procedural History**

In 2008, Jefferson County decided to repair and renovate the courthouse in Madison, Indiana. An architect was hired to design the renovation, and the renovation involved repairs to the roof of the courthouse, its flashing, gutters, and downspouts.

Jefferson County accepted Teton Corporation's bid for the repairs. Teton subcontracted with Innovative Roofing to furnish labor and materials for the roofing work. Innovative Roofing sub-subcontracted with Gutapfel Roofing to repair the courthouse's downspouts.

Jefferson County's agreement with Teton Corporation incorporated a form construction project contract prepared by the American Institute of Architects ("AIA"). The relevant AIA contractual provisions relating to insurance and subrogation provide:

> **11.3.1** Unless otherwise provided, the Owner [Jefferson County] shall purchase and maintain . . . property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis without voluntary deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made . . . or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 11.3 to be covered, whichever is earlier. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work.

> **11.3.1.1** Property insurance shall be on an "all-risk" policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's services and expenses required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

> **11.3.1.2** If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as

3

described above, without so notifying the Contractor, then the Owner shall bear all reasonable costs properly attributable thereto.

**\*\*\***

**11.3.3. Loss of Use Insurance**. The Owner, at the Owner's option, may purchase and maintain such insurance as will Insure the Owner against loss of use of the Owner's property due to fire or other hazards, however caused. The Owner waives all rights of action against the Contractor for loss of use of the Owner's property, including consequential losses due to fire or other hazards however caused.

**11.3.5** If during the Project construction period the Owner insures properties, real or personal or both, adjoining or adjacent to the site by property insurance under policies separate from those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Subparagraph 11.3.7 for damages caused by fire or other perils covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

**\*\*\***

**11.3.7 Waivers of Subrogation**. The Owner and Contractor waive all rights against [] each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work, except such rights as they have to the proceeds of such insurance held by the Owner as fiduciary. . . .

Appellant's App. pp. 585-86. The AIA contract also defines the term "Work" as "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or part of the Project." Id. at 571.

4

Jefferson County did not obtain separate property (or builder's risk) insurance for the courthouse project, but relied instead on its existing property and casualty insurance policy with St. Paul Fire and Marine Insurance Company. Jefferson County also did not inform Teton Corporation that it did not intend to obtain separate insurance for the project. The AIA contract also required Teton to obtain contractor's liability insurance.

On May 20, 2009, during the renovation, a devastating fire occurred at the Jefferson County Courthouse, which caused over six million dollars in damage. Per the terms of its insurance policy, St. Paul made payments to Jefferson County for damages caused by the fire.

Thereafter, on May 16, 2011, Jefferson County filed a complaint against the Appellees alleging negligence, breach of implied warranties, and breach of contract. Specifically, Jefferson County alleged that Appellee Gutapfel Roofing's negligence was the primary cause of the fire, but also alleged that Appellees Teton Corporation and Innovative Roofing were negligent as well.

All Appellees later filed separate motions for summary judgment. Each Appellee's motion argued that Jefferson County agreed to provide insurance for the project, and the County waived its subrogation rights against the Appellees; therefore, Jefferson County was not entitled to recover damages from the Appellees that were caused by the fire. Jefferson County responded to the Appellees' motions and also filed its own motion for partial summary judgment. The trial court held a hearing on the motions on September 25, 2012.

On November 21, 2012, the trial court granted the Appellees' motions for summary judgment and determined that as a result, Jefferson County's motion for partial summary judgment concerning the issue of vicarious liability was moot. The trial court issued the following pertinent findings of fact to support its decision:

> 4. The Plaintiff was obligated to provide insurance to cover the remodeling project, commonly referred to as builder's risk insurance. Plaintiff chose not to obtain a separate policy and instead the property was covered by the general policy of insurance maintained by Jefferson County.
> 5. In addition to the requirement for the Plaintiff to provide insurance for the project is the provision found in section 11.3.7 of the contract between Plaintiff and Defendant, Teton Corporation. In summary form that provision of the contract provided for a mutual waiver of the right of subrogation between the Plaintiff and Defendant, Teton Corporation, and all "subcontractors, sub-subcontractors, agents and employees . . . ."
> 6. Of these facts there is no genuine issue in dispute. The contractual provisions reflect the agreement that Plaintiff as owner was to provide insurance and that insurance, along with the insurance maintained by the various Defendants, would be the source of compensation in the event of a loss and each and every party would waive the right to seek recovery of the loss covered by the policy of insurance.
> 7. Contractual provisions such as those existing in the present case do not reflect an effort to avoid or escape responsibility. On the contrary, such provisions serve a public interest by defining the costs to which a party obligates itself, allocating risk and thereby reducing litigation.

Appellant's App. p. 14.

Jefferson County subsequently filed a motion to correct error arguing that the Appellees failed to submit evidence to the trial court to establish that Jefferson County's claimed damages were paid by insurance and asked the court to reconsider its decision concerning the applicability of the waiver of subrogation provision. In its motion, the County alleged that not all damages were covered by its St. Paul insurance policy, and the County spent a considerable amount of its own funds for repairs to the courthouse

6

after the fire. The trial court denied the County's motion to correct error on January 11, 2013, and this appeal ensued.[1]

## Standard of Review

Jefferson County argues that the trial court erred when it granted the Appellees' motions for summary judgment. Our standard of review of summary judgment appeals is well established:

> When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment as a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009) (citations omitted). The party appealing a summary judgment decision has the burden of persuading this court that the grant or denial of summary judgment was erroneous. Knoebel v. Clark County Superior Court No. 1, 901 N.E.2d 529, 531-32 (Ind. Ct. App 2009). Where the facts are undisputed and the issue presented is a pure question of law, we review the matter de novo. Crum v. City of Terre Haute ex rel. Dep't of Redev., 812 N.E.2d 164, 166 (Ind. Ct. App. 2004). Finally, our standard of review is not altered by

---

[1] We held oral argument in this case on November 21, 2013. We commend counsel for the quality of their written and oral advocacy.

the fact that the parties filed cross-motions for summary judgment. <u>Ind. Farmers Mut. Ins. Grp. v. Blaskie</u>, 727 N.E.2d 13, 15 (Ind. Ct. App. 2000).

Furthermore, resolution of this case turns primarily upon interpretation of the parties' contract. "The construction of a contract is particularly well-suited for de novo appellate review, because it generally presents questions purely of law." <u>Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co.</u>, 983 N.E.2d 574, 577 (Ind. 2013). The primary goal of contract interpretation is "'to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties.'" <u>Id</u>. at 577-78 (quoting <u>First Fed. Sav. Bank of Ind. v. Key Markets, Inc.</u>, 559 N.E.2d 600, 603 (Ind. 1990)). Clear, plain, and unambiguous language is conclusive of the parties' intent, and we will neither construe unambiguous contract language nor add provisions not agreed to by the parties. <u>Vincennes University ex rel. Bd. of Trustees of Vincennes v. Sparks</u>, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2013), <u>trans. denied</u>. "A contract is not ambiguous merely because the parties disagree as to its proper construction; rather, a contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." <u>Id</u>. We must attempt to interpret a contract by reading it as a whole and construing its language so as not to render any words, phrases, or terms ineffective or meaningless. <u>Id</u>. When reading all the terms of a contract together, more specific terms control over any inconsistent general statements. <u>Id</u>.

8

**Discussion and Decision**

Jefferson County concedes that pursuant to the terms of the AIA contract subrogation is barred when a property owner seeks to recover damages to its insured "Work" property, but maintains that "this case involves damage to *non*-Work property." Appellant's Br. at 10 (emphasis in original). And therefore, Jefferson County argues that under the AIA contract, Teton was responsible for procuring insurance to cover damages for claims "other than to the Work." Appellant's Br. at 7. In support of its argument, Jefferson County relies on our court's prior decision concluding that under the AIA contract there is a distinction between Work and non-Work property, and the scope of the waiver is limited to damages to the Work. See Midwestern Indemnity Company v. Systems Builders, Inc., 801 N.E.2d 661 (Ind. Ct. App. 2004), trans. denied.

The waiver of subrogation clause at issue is well known and often used in the construction industry. See American Zurich Ins. Co. v. Barker Roofing L.P., 387 S.W.3d 54 (Tex. Ct. App. 2012). Interpretation of the waiver provision has been litigated in courts throughout the country, including in our court. However, our supreme court has not addressed this issue, and therefore, the Appellees urge us to consider decisions from other states in support of their interpretation of the AIA contract provisions at issue.

A. *The Indiana Decisions to Date (i.e. the Minority Approach)*

In South Tippecanoe School Building Corp. v. Shambaugh & Son, Inc., the school corporation sought damages for losses sustained in a gas explosion and fire at a school that was under construction. The school corporation sued various contractors, alleging negligence among other theories of recovery. 182 Ind. App. 350, 395 N.E.2d 320 (Ind.

9

Ct. App. 1979). After the school corporation's insurer paid the corporation $74,628.63 for the damages under a builder's risk policy it had issued, the insurance company pursued a subrogation action against the contractors. The insurer claimed that the AIA contract's waiver of subrogation provision did not bar recovery of amounts covered by the builder's risk policy.

We disagreed and concluded that "'an agreement to provide insurance constitutes an agreement to limit recourse of the party acquiring the policy solely to its proceeds even though the loss may be caused by the negligence of the other party to the agreement.'" 395 N.E.2d at 326-27 (quoting Morsches Lumber, Inc. v. Probst, 180 Ind.App. 202, 203, 388 N.E.2d 284, 285 (1979)). The AIA contract established the "intent to place any risk of loss on the Work on insurance," and the "requirement of waivers, . . . [was] consistent with an intent to place the risk of loss on insurance." Id. at 360, 395 N.E.2d at 326. Moreover, our court observed that the insurance provisions of the AIA standard contract "reveal a 'studied attempt' by the parties to require construction project risks to be covered by insurance and to 'allocate among the parties the burden of acquiring such insurance.'" Id. at 326. Finally, our court concluded that if a construction project owner failed to take out sufficient insurance "'to cover the cost of the undertaking,'" the owner—not the contractors—was required to bear the loss caused by such a miscalculation. Id. at 334 (quoting Morsches, 180 Ind. App. at 206, 388 N.E.2d at 387).

Much later, in Midwestern Indemnity, the parties raised an issue not addressed in South Tippecanoe: whether the property owner waived subrogation rights for damage to

10

"non-Work" property. In that case, the general contractor and property owner entered into substantially the same AIA contract at issue in this appeal. The general contractor was hired to construct an addition to a commercial building. Approximately six months after the building addition was completed, a portion of the addition collapsed during a snowstorm. The property owner was insured by Midwestern Indemnity under a policy issued after completion of the construction. Midwestern Indemnity paid the property owner nearly $1.4 million for the loss, and of that amount approximately $45,000 was for damage to the contents of the building. Midwestern Indemnity, as subrogee of the property owner, filed a complaint against the general contractor and its subcontractors to recover what it had paid. The trial court ultimately entered summary judgment in favor of the subcontractor, which Midwestern Indemnity appealed.

That panel of our court observed that under the AIA contract, "waiver of subrogation applies to recovery for damages from perils insured against under the property insurance policy." 801 N.E.2d at 672. However, the panel also stated that "the waiver of subrogation is limited in scope as to what property is covered." Id. The Midwestern Indemnity panel stated that the waiver of subrogation is limited to the work performed under the contract and concluded:

> By definition, "Work" does not include the contents that were placed in the building after it was completed. Further, the waiver of subrogation applies to damage caused by perils insured against by the "property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work...." Accordingly, the scope of the waiver of subrogation is limited to the value of the Work performed under the contract, i.e., the building addition. Because the contents are not part of the Work or completed building addition and because there was no requirement to waive subrogation rights as to property damage to property other than the

11

Work, we hold that the waiver of subrogation does not bar recovery for damage to the contents of the building.

Id. at 673 (citation omitted).[2] Jefferson County relies heavily on the "Work" v. "non-Work" distinction recognized by the Midwestern Indemnity panel.

Recently, another panel of our court decided Allen County Public Library v. Shambaugh & Son, L.P., et al., 997 N.E.2d 48 (Ind. Ct. App. 2013). In that case, the Library hired contractors to renovate and add to its main library branch building. Before construction commenced, the Library obtained a "Builders Risk Plus" insurance policy specifically to cover the library renovation and addition jobsite.

While installing a concrete floor in the Library's basement to support the installation of an emergency diesel generator and two diesel fuel storage tanks, a steel stake driven into the ground pierced a copper pipe. This caused approximately 3000 gallons of diesel fuel to leak into the ground underneath the Library. The Library cleaned up the leaked fuel and filed a claim under its "Builders Risk Plus" policy. The policy excluded coverage for damage to the water, land, grading or fill. However, "the policy also contained a specific 'coverage extension' for 'Pollutant Clean Up and Removal' to cover expenses to extract pollutants 'from land or water at a job-site' resulting in loss to 'Covered Property.' This coverage carried its own separate policy limit of $5,000." Id.

---

[2] In reaching this conclusion, the panel relied on Town of Silverton v. Phoenix Heat Source System, Inc., 948 P.2d 9 (Colo. Ct. App. 1997), a decision from the Colorado Court of Appeals. In that case, the Town of Silverton entered into a contract for installation of a new roof on the town hall, which included the terms of the AIA contract. The project was completed in May 1991, and in November 1992, the town hall was damaged by fire. The Town argued that the waiver of subrogation was limited to damage to the roof and not to other parts of the town hall damaged by the fire. The Colorado court agreed and concluded that "the waiver of subrogation is limited to the value of the work performed under the contract, i.e., the new roof, and is inapplicable to other parts of the town hall damaged in the fire." Id. at 12.

12

at 51 (record citation omitted).  The Library's carrier paid the $5000 policy limit to the

Library.  The Library subsequently sued the general contractor and subcontractors to

recover the nearly $500,000 it had incurred to clean up the diesel fuel leak.

The general contractor and subcontractors argued that the Library had waived its

right to seek subrogation for the diesel fuel cleanup under the terms of the AIA contract.

Citing extensively to our court's holding in Midwestern Indemnity, the Allen County

Public Library panel concluded that the Library was not contractually prohibited from

seeking recovery in subrogation from the contractors for the pollution remediating costs.

Specifically, the panel stated:

> the Library is alleging that the diesel fuel leak spread beyond the strict confines of the library construction project and seeped into the surrounding land, and that the Library has incurred and will continue to incur significant costs associated with remediating that seepage from the land. The Library was only required by Section 11.3.1 of the AIA contract to cover the cost of "the entire Work at the site on a replacement cost basis," just as in Midwestern. The definition of "the Work" likewise is identical to the definition in Midwestern—"the construction and services required by the Contract...."  This evidences an intent that the Library was under no obligation to procure insurance for damage to property surrounding the jobsite or to property outside of the building project itself. Such damages could well exceed and be completely unrelated to the total replacement cost of "the Work." As such, the waiver of subrogation provision in Section 11.3.7 does not apply to damaged, contaminated land outside of "the Work"—i.e ., the library building addition and renovation.

Id. at 54 (record citation omitted).[3]

B. *The Majority Approach*

---

[3] This case is not yet certified.  It was handed down on October 22, 2013, and the Appellees filed a petition for rehearing.  On January 28, 2014, the Allen County Public Library panel issued an opinion on rehearing to address certain arguments raised in the petition, but reaffirming the original decision in all respects.

13

The majority of courts that have addressed the waiver of subrogation issue under AIA contract documentation has rejected the "Work" v. "non-Work" approach adopted by the Midwestern Indemnity panel and followed by the Allen County Public Library panel. Their approach turns on both the standardized language of the AIA contract and the public policy behind it.

For example, the Nebraska Supreme Court declined to adopt the "Work" v. "non-Work" approach in Lexington Insurance Co. v. Entrex Communication Services, Inc., 749 N.W.2d 124 (2008). In that case, the property owner entered into an AIA contract with Entrex to remove an analog antenna from its broadcast tower and replace it with a digital antenna. To provide insurance coverage for the project, the property owner relied upon its existing "all-risk" property insurance policy instead of obtaining a separate and specific "builder's risk" property insurance policy to cover the Project. The broadcast tower collapsed approximately six months after the antenna was replaced causing damage to the antenna (the "Work" property), tower, transmission building, and personal property within the building. The property owner sued the contractor alleging the contractor's gross negligence caused the collapse.

Rejecting the minority "Work" v. "non-Work" approach, the Nebraska Supreme Court discussed the provision equivalent to Section 11.3.5[4] in the contract in this case and stated:

---

[4] The Lexington Insurance AIA contract contained the relevant and analogous property insurance provisions in Article 11, Chapter 4. As we noted in the Facts and Procedural History section, Section 11.3.5 of the AIA contract at issue here states:

> If during the Project construction period the Owner insures properties, real or personal or both, adjoining or adjacent to the site by property insurance under policies separate from

We understand this provision to mean that if the owner acquires a separate property insurance policy to cover non-Project property —a policy that did not cover the Project or Work property— and the non-Project property is damaged, the owner waives subrogation rights for the insurer as to those damages. So even though the damage occurred to non-Work property, the owner waived subrogation rights because the damages were insured. This provision shows that the contracting parties were not opposed to waiving damages to non-Work property.

Id. at 135.

In response to the property owner's citation to cases holding that the waiver of subrogation does not apply to non-work property, the Court stated:

the minority approach is inconsistent with the waiver's purpose of avoiding disruption and disputes among the parties to the project by eliminating the need for litigation. Adopting the minority approach would actually encourage litigation about whether the claimed loss was damage to the Work or non-Work property. More important, we are unable to reconcile subparagraph 11.4.5 with the minority approach. If we applied the minority approach, we would be left with two disparate results depending on whether the owner (1) purchased a single policy covering both the Work and the non-Work or (2) purchased two separate policies. An owner relying on a single policy, as Hearst did here, would waive only damages to the Work (11.4.7). But an owner purchasing two separate policies, as in the example above, would waive damages to both the Work (11.4.7) and the non-Work (11.4.5). We do not believe the parties intended this disparity. Because we must construe the contract as a whole, subparagraph 11.4.5 is a hurdle that prevents us from deciding that the minority approach is a reasonable interpretation of subparagraph 11.4.7.

Id. at 136. Ultimately, the Nebraska Supreme Court concluded that "the waiver of subrogation applies to all damages covered by a property insurance policy 'obtained

_____

those insuring the Project, or if after final payment property insurance is to be provided on the completed Project through a policy or policies other than those insuring the Project during the construction period, the Owner shall waive all rights in accordance with the terms of Subparagraph 11.3.7 for damages caused by fire or other perils covered by this separate property insurance. All separate policies shall provide this waiver of subrogation by endorsement or otherwise.

Appellant's App. p. 586.

15

pursuant to . . . Paragraph 11.4' or other property insurance policy that covers the Work. When that policy is broad enough to cover both the Work and the non-Work property, the waiver extends to non-Work damages." Id.

The Lexington Ins. Co. case relied extensively on a much earlier decision from the California Court of Appeals, Lloyd's Underwriters et al. v. Craig and Rush, Inc., et al., 26 Cal. App. 4th 1194 (1994), in reaching its conclusion. In that case, the property owner hired Craig and Rush to perform repairs to its roof. During the construction, rain intruded and caused damage to the interior of the facility. The property owner's insurance company, Lloyd's Underwriters, paid for the damage (less the deductible) and then sued Craig and Rush and additional contractors for the contractors' alleged negligence.

The property owner and contractors had entered into the standard AIA contract, which obligated the owner to maintain property insurance for "the Work" and contained a waiver of claims that were covered by insurance. Notably, the provisions of the AIA contract in Lloyd's Underwriters were substantially the same as the provisions at issue in this appeal. Also, as in this case, the property owner in Lloyd's Underwriters elected not to purchase a separate "builder's risk" policy but relied on its existing "all risk" policy to satisfy its obligations under the AIA contract.

After the losses to "non-Work" property, Lloyd's as the subrogee of the owner argued that under the AIA contract a loss "outside the Work" would remain the contractors' responsibility. Id. at 1200. The California Court of Appeals rejected Lloyd's argument stating:

16

> This contention, however, ignores the language defining the scope of claims falling within the waiver clause. The waived claims are not defined by what property is harmed (i.e., "any injury to the Work"); instead, the scope of waived claims is delimited by the source of any insurance proceeds paying for the loss (i.e., whether the loss was paid by a policy "applicable to the Work").

Id.

The Massachusetts Court of Appeals' decision in Haemonetics Corp. v. Brophy & Phillips Co., Inc. et al., 501 N.E.2d 524 (Mass. Ct. App. 1986) is yet another example of the majority approach. In Haemonetics, the property owner entered into a 1977 standard AIA form contract for the construction of a mezzanine in its building. While a subcontractor was engaged in electric arc welding during the construction, a fire occurred causing damage to the property owner's real and personal property. The property owner had relied on an existing property insurance policy to meet its obligation to provide property insurance under the terms of the AIA contract, and the owner was compensated for its loss by the "all risks" insurance carrier that provided that coverage. The parties further agreed that the damage sustained by the property owner for which it received the insurance proceeds was not damage to the "Work" as that term is defined in the AIA contract.

The property owner argued that under the terms of the AIA contract its waiver of subrogation only applied to damages to the Work property. The Massachusetts Court of Appeals disagreed and concluded that "the preexisting insurance policy . . . was the insurance the owner chose to provide to comply with § 11.3 even though that policy may have been more extensive than what was required. By the terms of [the waiver of

subrogation provision], the waiver of rights extends to the proceeds of any insurance provided under § 11.3." Id. at 526.

The Ohio Court of Appeals recently considered this issue in Westfield Insurance Group v. Affinia Development, LLC., 982 N.E.2d 132 (Ohio Ct. App. 2012), and adopted the majority approach. In that case, the property owner entered into an AIA contract with certain contractors for renovations and improvements to its headquarters. As in the case before us, during the construction, a fire ensued which damaged the entire structure. The property owner did not purchase a builder's risk policy, but relied on its commercial property insurance policy to cover both the structure and contents of the building, and Westfield Insurance paid the property owner's claim in excess of $100,000. Westfield, as a subrogee of the property owner, sued the contractors alleging that their negligence caused the fire.

After reviewing the differing reasoning of courts across that country interpreting the AIA contract's waiver of subrogation, the Ohio Court of Appeals concluded that the majority approach "is consistent with the plain and unambiguous language of the Contract and furthers the purpose of the waiver clause as a risk-shifting provision."[5] Id. at 144. The court observed: "The Contract defined the waived claims by the source of

_____

[5] Like the Nebraska court, the Ohio court relied on section 11.3.5 in arriving at its conclusion. There are two minor differences between section 11.3.5 in the above cited cases and the contract language at issue in this case. Jefferson County's AIA contract with the contractors substitutes the word "adjoining" for "at" and the word "causes of loss" for "perils." See Appellant's App. p. 586.

18

the insurance proceeds, not by the property damaged. It is not relevant to the analysis as to whether the damage was to Work or non-Work property."[6] Id.

C. *The AIA Contract between Jefferson County and the Appellee Contractors*

Applying the law to this case, we begin and end with the standard language of the AIA contract the parties chose to use to memorialize their agreement regarding the construction project. That form contract has long been recognized as having as a central tenet its intention to liquidate and settle construction-related claims through non-subrogated insurance coverage purchased specifically for the project. See Lexington Ins. Co., 749 N.W.2d at 135; Haemonetics Corp., 501 N.E.2d at 526.

Under the plain language of this AIA contract, Jefferson County was directed to insure the construction project and the building or property it pertains to, and to waive claims against the associated contractors for losses covered by its insurance. The contract contains the following specific requirements concerning property insurance coverage:

> Unless otherwise provided, the Owner [Jefferson County] shall purchase and maintain . . . property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis without voluntary deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made . . . or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 11.3 to be

---

[6] See also American Zurich Ins. Co. v. Barker Roofing, L.P., 387 S.W.3d 54, 64-65 (Tex. Ct. App. 2012) (observing that "waived claims are not defined by what property is harmed, but by the source of any insurance proceeds paying for the loss"); ASIC II Ltd. v. Stonhard, Inc., 63 F.Supp.2d 85, 92 (D.Me. 1999) (concluding that waiver clause did not restrict waiver of damages to Work but to proceeds of any insurance provided under the contract); Employers Mut. Cas. Co. v. A.C.C.T., Inc., 580 N.W.2d 490, 493 (Minn. 1998) (concluding that if owner relies on an existing policy broad enough to cover the Work and the non-Work property, it waives right to sue for all damages so long as that damage is covered by the policy).

19

covered, whichever is earlier. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work.

Appellant's App. p. 585.

The unambiguous contract language instructed Jefferson County not only to have in force or even just maintain insurance on the project, but rather, to both "purchase and maintain" the insurance. Subsection 11.3.1.1 further requires the Owner, i.e. Jefferson County, to purchase "property insurance on an all-risk policy form," which "shall insure against the perils of fire and extended coverage and physical loss or damage. . . ." Id.

The AIA contract also contains specific provisions requiring Teton, as the general contractor, to purchase liability insurance. Section 11.1.1 of the AIA contract obligated Teton to purchase liability insurance to protect itself from certain specifically delineated types of claims "which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable."[7] Id. at 584. And the Contractor was required to file certificates of insurance with the Owner before the Work began. Id. at 585.

_____

[7] In support of its argument that it did not waive its subrogation rights to non-work damages, Jefferson County cites to 11.1.1.5 of the AIA contract which required Teton to "purchase and maintain" *liability* insurance to protect itself from "claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom[.]" Appellant's App. p. 585. However, the purpose of the Section 11.1.1 liability insurance requirement is to assure the Owner that the Contractor is insured against claims by third parties for alleged damages or negligent acts for which the Contractor is liable. Moreover, there is no language in Section 11.1.1 that would allow Jefferson County to recover damages to non-Work property insured under its own property insurance.

20

The AIA contract also required Jefferson County to notify Teton if it chose not to purchase the "all risk" property insurance called for in section 11.3.1.2, and granted Teton the right to obtain the coverage and pass its premium cost on to Jefferson County through a change order. See id. Section 11.3.1.2 specifically provides:

> If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, *the Owner shall so inform the Contractor in writing prior to commencement of the Work.* The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner.

Id. (emphasis added).

While Jefferson County had the right not to purchase separate "all risk" insurance under Section 11.3.1, it breached the contract by failing to notify Teton under Section 11.3.1.2 of its decision to rely on existing coverage, and that breach had several important effects. First, because such separate, non-subrogated coverage is so important to the parties' relationships under the contract, Jefferson County's failure to notify rendered Teton unable to take advantage of the provisions of Section 11.3.1.2, which would have allowed Teton to purchase the contemplated separate coverage at Jefferson County's cost.[8] Next, Section 11.3.1.2 provides that "[i]f the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor, then the Owner shall bear all reasonable costs properly

---

[8] We cannot agree with the dissent's conclusion that Jefferson County's blanket property and casualty insurance policy "meets the definition of an 'all risk' policy." Slip op. at 31 (Brown, J., dissenting). Conflation of the two very different types of insurance is what allows work v. non-work litigation to proliferate. Jefferson County's existing, subrogated insurance coverage did not provide the independent, non-subrogated coverage that Jefferson County was required either to purchase or to notify Teton of its decision not to purchase under the AIA contract at issue.

21

attributable thereto." Id. The Owner's separate "all-risk" and Contractor's liability policies required under the AIA contract, together with the notice thereof that each was properly insured before work on the project would begin, clearly indicate all parties' reasonable expectations that their insurers' subrogation rights would be waived under their respective coverages for the Project.

While the Owner's obligation to purchase "all-risk" insurance is clearly stated in the AIA contract, Jefferson County points to alleged ambiguity in the waiver of subrogation clause in Section 11.3.7 of the contract. That section provides:

> The Owner and Contractor waive all rights against [] each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other . . . *for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work*, except such rights as they have to the proceeds of such insurance held by the Owner as fiduciary. . . .

Id. at 586 (emphasis added). The Jefferson County Commissioners rely on this language, and the minority view of the language, to claim that Teton Corporation is liable for the damages claimed to areas that were not part of the project, i.e., to "non-Work."

However, we believe that Jefferson County's limited interpretation of the waiver of subrogation does not further the underlying purpose of the waiver, i.e. "encouraging parties to anticipate risks and to procure insurance covering those risks, thereby avoiding future litigation, and facilitating and preserving economic relations and activity." See Lexington Ins. Co., 749 N.W.2d at 131. Furthermore, Jefferson County's proposed interpretation ignores the language defining the scope of claims falling within the waiver clause. Id. at 135. In this regard, Section 11.3.7 also provides:

22

> A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

Appellant's App. p. 586. In our view, this language "reconciles any inconsistency between the waiver of subrogation and the [AIA] agreement's allocation of insurance responsibilities." See Lexington Ins. Co., 749 N.W.2d at 136.

When Section 11.3.7 is considered within the context of the entire AIA contract, the Owner's contractual obligation to purchase "all-risk" insurance leads us to conclude that the majority view is the better interpretation of this ambiguity and the better approach to risk allocation in construction projects in general. We agree with the Ohio Court of Appeals that "[w]aiver of subrogation is useful in construction contracts because it avoids disrupting the project and eliminates the need for lawsuits because it offers certainty as to the liability of the parties. . . . [B]y applying the waiver to all losses covered by the owner's property insurance, the parties avoid the predictable litigation over liability issues and whether the claimed loss was damage to Work or non-Work property." Id. at 145. See also American Zurich Ins. Co. v. Barker Roofing, L.P., 387 S.W.3d 54, 62 (Tex. Ct. App. 2012) (stating "a waiver of subrogation clause substitutes the protection of insurances for the uncertain and expensive protection of liability litigation"). Adoption of the minority, non-Work distinction would throw many projects into protracted litigation, possibly even years after project completion and acceptance.

Each and every major construction project adds both value and risk to the owner's property. Section 11.3.1 of the AIA contract therefore requires owners to insure their

23

interests in the construction project at least to the value of the underlying contract. The AIA contract expressly requires property owners to separately insure these interests and, in order to facilitate the completion of the project without delaying and debilitating litigation, to obtain an "all-risk" insurance policy that waives the carrier's rights to be subrogated to any loss arising within the extremely broad coverage described in the contract.[9] If the owner does not secure such insurance, then it still waives its subrogation rights for any loss described within the AIA contract that it sustains. See e.g. Westfield Ins. Group, 982 N.E.2d at 141; Lexington Ins. Co., 749 N.W.2d at 135. This waiver is the product of both the language of the contract and longstanding public policy. See South Tippecanoe School Bldg. Corp., 182 Ind. App. at 360, 395 N.E.2d at 326 (recognizing that the purpose of insurance and waiver of subrogation provisions of the AIA contract constitute a "studied attempt by the parties to require construction project risks to be covered by insurance and to allocate among the parties the burden of acquiring such insurance"). This is the conclusion reached by the majority of states who have

---

[9] Property owners must take care to insure the project-related risks for which they desire coverage when purchasing and maintaining non-subrogated builder's risk insurance required by AIA documentation. The AIA contract language clearly allows an owner to purchase coverage in excess of that generally or specifically described in the contract, and in a modern world of ever-larger environmental risks, it is certainly prudent to purchase environmental coverage for a large construction project. However, under the majority view that we adopt in this case, owners would be limited in their recovery to the description and amount of such environmental coverage they "purchase[d] and maintain[ed]" and would waive subrogation rights under such coverage. Cf. Allen County Public Library v. Shambaugh & Son, L.P., et al., 997 N.E.2d 48 (Ind. Ct. App. 2013). Specifically, applying the majority view that we adopt in this appeal to the facts and circumstances in the Allen County Public Library case would limit the Library's recovery to the amount of environmental insurance coverage purchased by the Library, i.e. $5000. This result is in keeping with the underlying rationale of AIA contractual documentation, which seeks to liquidate and cover such losses according to the builders risk coverage obtained by the Owner for that purpose. This result also eliminates the inevitable work v. non-work disputes driven by owners' generic, subrogated property and casualty insurance.

24

considered the waiver of subrogation, and we find it to be the more logical and compelling resolution.

For all of these reasons, we disagree with the <u>Midwestern Indemnity</u> panel and hold that, under the terms of the AIA contract, Jefferson County's claims for damages against the Appellees are barred.[10] We therefore affirm the trial court's entry of summary judgment in favor of the Appellees.

Affirmed.

NAJAM, J., concurs.

BROWN, J., dissents with separate opinion.

---

[10] In its brief, Jefferson County argued that a property owner does not waive its right to subrogate when the conduct at issue was grossly negligent, willful or wanton, and that it designated evidence creating a genuine issue of material fact as to whether the Appellees were grossly negligent, or acted willfully and wantonly. Although stated *in dicta*, our court has observed that where a property owner's loss is caused by a contractor's gross negligence or willful and wanton acts, the property owner may assert its subrogation rights despite a contractual waiver of such rights. See <u>S.C. Nestel, Inc. v. Future Const., Inc.</u>, 836 N.E.2d 445, 451 (Ind. Ct. App. 2005); <u>Morsches Lumber v. Probst</u>, 388 N.E.2d 284 (Ind. Ct. App. 1979).

      Gross negligence is defined as "'[a] conscious, voluntary act or omission in reckless disregard of . . . the consequences to another party.'" <u>Ind. Pub. Serv. Co., v. Sharp</u>, 790 N.E.2d 462, 465 (Ind. 2003) (quoting Black's Law Dictionary 1057 (7th ed. 1999). And conduct is wanton and willful if the intentional act is done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time. See <u>Davidson v. Bailey</u>, 826 N.E.2d 80, 89 (Ind. Ct. App. 2005).

      Jefferson County argues that Teton and Innovative Roofing were grossly negligent for failing to supervise Gutapfel Roofing and by allowing Gutapfel to hot solder a historically significant building without any training or assistance. But, the designated evidence establishes that Gutapfel was aware of the risks inherent in its work and took precautions to guard against fire. Moreover, Gutapfel proposed use of an adhesive bond instead of solder to attach new copper gutters to the existing copper box gutters. Jefferson County rejected Gutapfel's proposal and instructed him to use solder. Gutapfel also extensively checked the downspout area for heat and smoke after it finished soldering. Jefferson County has not designated any evidence that would establish that Gutapfel or the other Appellee contractors were grossly negligent (or acted willfully or wantonly) in this case.

# IN THE
# COURT OF APPEALS OF INDIANA

THE BOARD OF COMMISSIONERS
OF THE COUNTY OF JEFFERSON,

    Appellant,

        vs.               No. 72A04-1302-CT-00055

TETON CORPORATION, INNOVATIVE
ROOFING SOLUTIONS, INC., GUTAPFEL
ROOFING, INC. and DANIEL L. GUTAPFEL,

    Appellees.

**BROWN, Judge, dissenting**

I respectfully dissent. This court, in Midwestern Indem. Co. v. Sys. Builders, Inc., 801 N.E.2d 661, 664 (Ind. Ct. App. 2004), trans. denied, examined a contract containing identical versions of Section 11.3.5 and 11.3.7 as are present here. In Midwestern, a snowstorm caused the collapse of a building which had been completed six months previously, causing $1,391,818.90 worth of damages, $44,971.21 of which pertained to damage of the contents of the building. 801 N.E.2d at 665. Among other issues, this court examined "whether the waiver of insurance and subrogation provisions of the construction contract bar recovery for amounts paid for damages to the contents of the building." Id. at 672. We noted that although the waiver provisions apply "to recovery for damages from perils insured against under the property insurance policy," they are

26

"limited in scope as to what property is covered." Id. We held that "[b]ecause the contents are not part of the Work or completed building addition and because there was no requirement to waive subrogation rights as to property damage to property other than the Work," the scope of such waiver did not include the contents of the building. Id. at 673. This court recently affirmed the reasoning of Midwestern in Allen Cnty. Pub. Library v. Shambaugh & Son, L.P., 997 N.E.2d 48, 53-56 (Ind. Ct. App. 2013) ("Consistent with our holding in Midwestern, we conclude that the Library is not precluded by Section 11.3.7 of the standard AIA contract from seeking recovery for pollution cleanup costs for property contaminated by the Defendants' allegedly faulty construction that is outside the scope of 'the Work' for which the Defendants were contracted to perform."), reh'g pending.

Furthermore, to the extent that the majority relies upon Lexington Ins. Co. v. Entrex Comm'n Servs., Inc., 749 N.W.2d 124 (Neb. 2008), and Westfield Ins. Grp. v. Affina Dev't, LLC, 982 N.E.2d 132 (Ohio Ct. App. 2012), I believe the relevant contract provisions in those cases are distinguishable and materially impact their applicability to the instant case. As noted above, Section 11.3.5 provides:

> If during the Project construction period the Owner insured properties, real or personal or both, *adjoining or adjacent to* the site by property insurance under policies separate from those insuring the Project . . . the Owner shall waive all rights in accordance with the terms of Subparagraph 11.3.7 for damages caused by fire or other perils covered by this separate property insurance.

27

Appellants' Appendix at 586 (emphasis added). As noted by the majority, the versions of this provision used in Lexington Ins. Co. and Westfield Ins. Grp. substitute the word "at" for the word "adjoining" in the emphasized portion above. See Draft at 18 n.5.

The majority declares the versions used in Lexington Ins. Co. and Westfield Ins. Grp. to be "equivalent" or "analogous" to the version at issue here, deeming any differences to be "minor." Id. at 14, 14 n.4, 18 n.5. I disagree. The American Heritage Dictionary defines the word "at" as follows: "**1a**. In or near the area occupied by; in or near the location of: *at the market; at our destination*. **b**. In or near the position of: *always at my side; at the center of the page. . . .*" AMERICAN HERITAGE DICTIONARY 112 (4th ed. 2006). Conversely, the dictionary defines the term "adjoining" as "[n]eighboring; contiguous," and "adjoin" as: "**1**. To be next to; be contiguous to: *property that adjoins ours*. **2.** To attach: '*I do adjoin a copy of the letter that I have received*' . . . To be contiguous. . . ." Id. at 21. The dictionary also defines "adjacent," which is present in both versions of Section 11.3.5., as "**1.** Close to; lying near: *adjacent cities*. **2.** Next to; adjoining: *adjacent garden plots. . . .*" Id.

Thus, the plain meaning of the terms "adjoining" and "adjacent" are synonymous, while the term "at," which is not present in the instant version of Section 11.3.5, carries a different meaning. Because the damaged personal property at issue was contained *within the work property, the courthouse*, the fact that the term "at" is not used in Section 11.3.5 is material. Simply put, the waiver provision in the instant version of Section 11.3.5 is applicable only to damage occurring to sites adjoining or adjacent to the courthouse, not personal property contained within the courthouse. Accordingly, I find that reliance upon

28

Lexington Ins. Co. and Westfield Ins. Grp. is misplaced. As discussed by the majority and in Lexington Ins. Co., the Nebraska Supreme Court adopted the "Majority Approach," concluding that "the scope of the waiver clause was not defined by the property damaged, but, rather, by the extent the damages were covered by those policies described in the clause." 749 N.W.2d at 134. After reciting subparagraph 11.4.5, which, as noted above, is akin to Section 11.3.5 except that it applies to policies insuring property "*at* or adjacent to the site," the court stated: "We understand this provision to mean that if the owner acquires a separate property insurance policy to cover non-Project property—a policy that did not cover the Project or Work property—and the non-Project property is damaged, the owner waives subrogation rights for the insurer as to those damages." 749 N.W.2d at 134-135 (emphasis added). The court observed that "Subparagraph 11.4.5 reinforces our conclusion that the waiver in subparagraph 11.4.7 applies to all damages— including Work and non-Work damages—covered by the owner's property insurance policy." Id. at 135. However, because Section 11.3.5 in the contract at issue here does not apply to property *at* the project site, the reasoning contained in Lexington Ins. Co. does not apply.

Thus, only the waiver language contained in Section 11.3.7 is applicable to the circumstances, and in my view the Work/non-Work or Minority Approach applies with equal force. Section 11.3.7, titled "Waivers of Subrogation," provides that "[t]he owner and Contractor waive all rights against [] each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other . . . for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this

29

Paragraph 11.3 or *other property insurance applicable to the Work . . . .*"  Appellant's Appendix at 586 (emphasis added).  This "either/or" language in the provision lets an owner choose between purchasing a builder's risk policy or relying upon another all-risk policy, and here Jefferson County chose to rely upon its general all-risk policy in accordance with the emphasized language.  This reading gives effect to both clauses in Section 11.3.7.  The "Work" involves refurbishing the courthouse building, and the general policy protects against damage to the building.  Indeed, the record appears to indicate that the policy *did* pay Jefferson County based upon such Work-related damages, and, in light of the fact that at the time of the contract Midwestern was valid Indiana law, I believe it was precisely what the parties agreed upon in allocating risk when they chose to use the term "adjoining" in place of the word "at."

Additionally I am not convinced by the majority's conclusion that Jefferson County was in material breach of the contract when it did not notify Teton of its intent to rely upon its existing all-risk policy rather than purchase a "builder's risk" policy.  Again, Section 11.3.1 provides that "[u]nless otherwise provided, the Owner [Jefferson County] shall purchase and maintain . . . property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site . . . ."  Appellant's Appendix at 585.  Section 11.3.1.1 denotes the specifics of the type of property insurance policy and states that such insurance:

> shall be on an 'all-risk' policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall

cover reasonable compensation for Architect's services and expenses required as a result of such insured loss.

Id.

"All-risk policies cover all losses, except those specifically excluded." Copper Mountain, Inc. v. Industrial Sys., Inc., 208 P.3d 692, 694 n.7 (Colo. 2009) (citing Heller v. Fire Ins. Exch., 800 P.2d 1006, 1007 n.1 (Colo. 1990)). The property insurance policy owned by Jefferson County was titled as "BLANKET BUILDING AND BUSINESS PERSONAL PROPERTY AT LOCATIONS SCHEDULED BELOW" which included the courthouse located at 300 West Main Street in Madison, Indiana. Appellee's Designation of Evidence at Tab 4, pages 358, 360. The limit of coverage to the building is listed at $25,859,000, and the policy notes that for "Business Personal Property" that the limit of coverage is "Incl W Bldg." Id. at 358. The policy also states, under the heading "Covered Causes Of Loss," that "[w]e'll protect covered property against risks of direct physical loss or damage except as indicated in the Exclusions – Losses We Won't Cover section." Id. at 369. Thus, the policy meets the definition of an "all-risk" policy.

The majority concludes that the County breached the agreement because it did not notify Teton of its decision to rely on existing coverage rather than procure separate all-risk insurance, relying on Section 11.3.1.2 which states: "If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work." Supra at 21; see also Appellants' Appendix at 585.

31

Section 11.3.1.2 specifically provides that the purpose of the notification would be that the contractor could "then effect insurance which will protect the interest of the Contractor, Subcontractors and Sub-subcontractors *in the Work*." Appellants' Appendix at 585 (emphasis added). However, there is no dispute that Jefferson County's property insurance policy covered the courthouse for work-related damages. It would have been superfluous for Teton to have purchased additional property insurance for the courthouse. Thus, any breach of the agreement by Jefferson County was not a material breach and should not dictate the outcome.

By adopting the Majority Approach, the majority extinguishes Jefferson County's ability to attempt to recoup damages from Teton's liability insurer based upon alleged negligence on the part of Teton and its subcontractors.[11] For the reasons discussed above,

---

[11] At oral argument, Teton's counsel suggested that Section 11.1.1, which obligated Teton to purchase liability insurance, applied only to claims by third parties. Section 11.1.1 provides:

> **11.1.1** The Contractor shall purchase from and maintain in a company or companies lawfully authorized to do business in the jurisdiction in which the Project is located such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:
>
> > **.1** claims under workers' or workmen's compensation, disability benefit and other similar employee benefit acts which are applicable to the Work to be performed;
> >
> > **.2** claims for damages because of bodily injury, occupational sickness or disease, or death of the Contractor's employees;
> >
> > **.3** claims for damages because of bodily injury, sickness or disease, or death of any person other than the Contractor's employees;
> >
> > **.4** claims for damages insured by usual personal injury liability coverage which are sustained by (1) by a person as a result of an offense

32

I believe this to be error, and I would uphold <u>Midwestern</u> and the so-called "Minority Approach" as valid Indiana law, and allow Jefferson County to bring suit under these circumstances to recoup liability damages to non-Work property. I respectfully dissent.

---

      directly or indirectly related to employment of such person by the Contractor, or (2) by another person;

**.5** claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom;

**.6** claims for damages because of bodily injury, death of a person or property damage arising out of ownership, maintenance or use of a motor vehicle; and

**.7** claims involving contractual liability insurance applicable to the Contractor's obligations under Paragraph 3.18.

Appellants' Appendix at 584-585. Although certain subsections of Section 11.1.1 are intended to apply to third parties, including Subsection .3 and the second part of Subsection .4, other portions, notably Subsection .5, do not appear to be so constrained.