

FILED

Oct 22 2013, 5:24 am

CLERK
of the supreme court,
court of appeals and
tax court

# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JONATHAN H. NUSBAUM**
Beers Mallers Backs & Salin, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE,
Shambaugh & Son. L.P.:

**BRIAN P. CLIFFORD**
**MICHAEL L. JAMES**
Faegre Baker Daniels, LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE,
Hamilton Hunter Builders, Inc.:

**JAMES J. SHEA**
**TIMOTHY W. DEGROOTE**
**ANDREW S. WILLIAMS**
Hunt Suedhoff Kalamaros, LLP
Fort Wayne, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ALLEN COUNTY PUBLIC LIBRARY, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 02A04-1302-PL-78 |
| | ) | |
| SHAMBAUGH & SON, L.P., | ) | |
| HAMILTON HUNTER BUILDERS, INC., | ) | |
| W.A. SHEETS & SONS, INC., and | ) | |
| MSKTD & ASSOCIATES, INC., | ) | |
| | ) | |
| Appellees. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Nancy Eshcoff Boyer, Judge
Cause No. 02D01-1002-PL-26

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

## Case Summary

Allen County Public Library ("the Library") appeals the trial court's grant of summary judgment in favor of Shambaugh & Son, L.P. ("Shambaugh"), Hamilton Hunter Builders, Inc. ("Hamilton Hunter"), W.A. Sheets & Sons, Inc. ("Sheets"), and MSKTD & Associates, Inc. ("MSKTD") (collectively "the Defendants"). We reverse and remand.

## Issue

The Library raises two issues, which we combine and restate as whether the trial court properly concluded that the Library was contractually prohibited from seeking recovery from the Defendants for pollution remediation costs related to construction work that the Library hired the Defendants to perform.

## Facts

In 2004, the Library undertook a capital improvement project to renovate and add to its main library branch building in Fort Wayne. The Library hired Sheets to act as construction project manager and MSKTD to act as project architect. The Library also contracted directly with Shambaugh to perform the project's mechanical, electrical, and fire protection work, and with Hamilton Hunter to perform the project's concrete work.

2

The Library's contracts with the Defendants were based on a form construction project contract prepared by the American Institute of Architects ("AIA"). The contracts contained various provisions related to insurance and subrogation. Sections 11.3.1, 11.3.1.1, and 11.3.1.2 of the contracts provided:

> 11.3.1   Unless otherwise provided, the Owner [THE LIBRARY] shall purchase and maintain . . . property insurance in the amount of the initial Contract Sum as well as subsequent modifications thereto for the entire Work at the site on a replacement cost basis without voluntary deductibles. Such property insurance shall be maintained, unless otherwise provided in the Contract Documents or otherwise agreed in writing by all persons and entities who are beneficiaries of such insurance, until final payment has been made . . . or until no person or entity other than the Owner has an insurable interest in the property required by this Paragraph 11.3 to be covered, whichever is earlier. This insurance shall include interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work.

> 11.3.1.1  Property insurance shall be on an "all-risk" policy form and shall insure against the perils of fire and extended coverage and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, falsework, temporary buildings and debris removal including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for Architect's services and expenses required as a result of such insured loss. Coverage for other perils shall not be required unless otherwise provided in the Contract Documents.

> 11.3.1.2  If the Owner does not intend to purchase such property insurance required by the Contract and with all of the coverages in the amount described above, the Owner shall so inform the Contractor in writing prior to commencement of the Work. The Contractor may then effect insurance which will protect the interests of the Contractor, Subcontractors and

3

Sub-subcontractors in the Work, and by appropriate Change Order the cost thereof shall be charged to the Owner. If the Contractor is damaged by the failure or neglect of the Owner to purchase or maintain insurance as described above, without so notifying the Contractor, then the Owner shall bear all reasonable costs properly attributable thereto.

App. p. 317. Section 11.3.7 of the contracts further provided:

Waivers of Subrogation. The Owner and Contractor waive all rights against each other and against the Construction Manager, Architect, Owner's other Contractors and own forces described in Article 6, if any, and the subcontractors, sub-subcontractors, consultants, agents and employees of any of them, for damages caused by fire or other perils to the extent covered by property insurance obtained pursuant to this Paragraph 11.3 or other property insurance applicable to the Work, except such rights as the Owner and Contractor may have to the proceeds of such insurance held by the Owner as fiduciary. . . .

Id. at 317.

As indicated by its capitalization, "the Work" was a term of art specifically defined by the AIA contract and referred to "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or part of the Project." Id. at 315. Also, in addition to the Library's obligation to procure property insurance under the contract, each of the Defendants was obligated to:

purchase . . . such insurance as will protect the Contractor from claims set forth below which may arise out of or result from the Contractor's operations under the Contract and for which the Contractor may be legally liable, whether such

4

operations be by the Contractor or by a Subcontractor or by anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable:

\* \* \* \* \*

5.      claims for damages, other than to the Work itself, because of injury to or destruction of tangible property, including loss of use resulting therefrom . . . .

Id. at 316.

Before work on the project began, the Library obtained a "Builders Risk Plus" insurance policy from Great American Insurance Group ("Great American") to specifically cover the library renovation and addition jobsite. Id. at 360. The property covered by the policy included:

building materials and supplies, equipment, machinery and fixtures . . . fences, foundations, excavations, underground pipes, drains, paving, and/or pilings at any construction job-site covered by this Coverage Form . . . which is, or intended to become, a permanent part of the structure(s) at the job-site(s) described in the Declarations.

Id. at 369. Excluded from the scope of the policy's coverage was "water, land (including land on which the property is located), grading or fill . . . ." Id. The policy's general limit of coverage was $54,920,000. However, the policy also contained a specific "coverage extension" for "Pollutant Clean Up and Removal" to cover expenses to extract pollutants "from land or water at a job-site" resulting in loss to "Covered Property." This coverage carried its own separate policy limit of $5,000. Id. at 371.

5

One part of the library renovation and addition project required Shambaugh to permanently install an emergency diesel generator and two diesel fuel storage tanks—one 1,000 gallon tank and one fifty gallon "day" tank—in the library's basement. Hamilton Hunter poured the concrete floor supporting the generator and tanks, and which also covered copper piping connecting the "day" tank and generator. Part of the concrete pouring process required Hamilton Hunter workers to create a wooden form for the concrete and drive steel stakes into the ground. In December 2007, the Library discovered that a hole in the copper piping had caused approximately 3,000 gallons of diesel fuel to leak into the ground underneath the library. The Library believes that the hole was caused by a Hamilton Hunter employee having driven a steel stake through the pipe.[1] The Library undertook to investigate and clean up the leaked fuel. The Library filed a claim with Great American related to the cleanup. Great American covered the claim and paid the Library $5,000, in accordance with the policy limits for pollution cleanup.

In 2010, the Library sued the Defendants to recover costs associated with the diesel fuel cleanup. The Library asserted in its complaint that it had incurred approximately $490,000 in cleanup-related expenses thus far, with the costs expected to increase. On July 9, 2012, Shambaugh moved for partial summary judgment, which was joined by Hamilton Hunter. The motion asserted that the Library had waived its ability to seek recompense for the diesel fuel cleanup by the AIA contract's provisions quoted

[1] Hamilton Hunter denies any responsibility for the hole in the pipe, but for purposes of summary judgment is not contesting the Library's claim that it caused the hole.

6

above—in particular Section 11.3.7—and its obtaining of pollution cleanup insurance coverage from Great American and payment from Great American.

On September 26, 2012, the trial court granted Shambaugh's and Hamilton Hunter's motion for partial summary judgment. On January 22, 2013, the trial court entered an order finding that Sheets and MSKTD also were entitled to summary judgment and that it was entering final judgment in favor of all of the Defendants. The Library now appeals.

**Analysis**

We review a trial court's summary judgment ruling de novo. Miller v. Dobbs, 991 N.E.2d 562, 564 (Ind. 2013). We will affirm a grant of summary judgment "'only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Overton v. Grillo, 896 N.E.2d 499, 502 (Ind. 2008)); see also Ind. Trial Rule 56(C). We must construe all evidence and resolve all doubts in favor of the non-moving party, so as to avoid improperly denying that party's day in court. Id.

Resolution of this case turns primarily upon interpretation of the parties' contracts. "The construction of a contract is particularly well-suited for de novo appellate review, because it generally presents questions purely of law." Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co., 983 N.E.2d 574, 577 (Ind. 2013). The primary goal of contract interpretation is "'to determine the intent of the parties at the time the contract was made as disclosed by the language used to express their rights and duties.'" Id. at 577-78

7

(quoting First Fed. Sav. Bank of Ind. v. Key Markets, Inc., 559 N.E.2d 600, 603 (Ind. 1990)). Clear, plain, and unambiguous language is conclusive of the parties' intent, and we will neither construe unambiguous contract language nor add provisions not agreed to by the parties. Vincennes University ex rel. Bd. of Trustees of Vincennes v. Sparks, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2013), trans. denied. "A contract is not ambiguous merely because the parties disagree as to its proper construction; rather, a contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." Id. We must attempt to interpret a contract by reading it as a whole and construing its language so as not to render any words, phrases, or terms ineffective or meaningless. Id. When reading all the terms of a contract together, more specific terms control over any inconsistent general statements. Id.

This court has been asked on several prior occasions to analyze the insurance and subrogation provisions of the AIA standard construction contract that are at issue here. In South Tippecanoe School Building Corporation v. Shambaugh & Son, Inc., 182 Ind. App. 350, 395 N.E.2d 320 (1979), we addressed a situation in which a gas explosion and fire damaged a high school that was under construction. The school corporation sued various contractors, alleging negligence among other theories of recovery. After the school corporation's insurer paid the corporation for the damages under a builder's risk policy it had issued, it continued a subrogation action against the contractors. On appeal,

8

the insurer claimed that the AIA contract's waiver of subrogation provision[2] did not bar recovery of amounts covered by the builder's risk policy.

We disagreed and held that "'an agreement to provide insurance constitutes an agreement to limit recourse of the party acquiring the policy solely to its proceeds even though the loss may be caused by the negligence of the other party to the agreement.'" South Tippecanoe, 183 Ind. App. at 361, 395 N.E.2d at 326-27 (quoting Morsches Lumber, Inc. v. Probst, 180 Ind. App. 202, 203, 388 N.E.2d 284, 285 (1979)). We also stated that the insurance provisions of the AIA standard contract "reveal a 'studied attempt' by the parties to require construction project risks to be covered by insurance and to 'allocate among the parties the burden of acquiring such insurance.'" Id. at 360, 395 N.E.2d at 326. We further noted that if a construction project owner failed to take out sufficient insurance "'to cover the cost of the undertaking,'" the owner—not the contractors—was required to bear the loss caused by such a miscalculation. Id. at 373, 395 N.E.2d at 334 (quoting Morsches, 180 Ind. App. at 206, 388 N.E.2d at 387). There does not appear to have been any question in South Tippecanoe that the full extent of the property damaged by the explosion and fire was the under-construction school building and not any property outside of the construction project.

In Midwestern Indemnity Company v. Systems Builders, Inc., 801 N.E.2d 661 (Ind. Ct. App. 2004), trans. denied, after completion of a construction project to add onto a factory, the roof of the new addition collapsed after a snowstorm, causing the loss of the

<hr>

[2] At the time, this provision was numbered 11.3.6, but it was worded nearly identically to the current provision numbered 11.3.7 in the version of the AIA contract utilized by the parties here.

building itself as well as the contents of the building. The factory owner's insurer paid $1,391,818.90 in total to the owner, of which $44,971.21 was for the building's contents. The insurer then brought a subrogation action against the subcontractor who designed and built the addition. We held that the waiver of subrogation provision of the AIA standard contract—section 11.3.7, as here—applied even though construction had already been completed, and also that the waiver applied to negligence claims against the subcontractor. Midwestern, 801 N.E.2d at 671-72.

Having established that section 11.3.7 applied to the factory owner/insurer's claims against the subcontractor, we went on to analyze whether the factory owner/insurer was prohibited from seeking recovery from the subcontractor for the loss of the contents of the building. Ultimately, we held there was no such prohibition, observing that "the waiver of subrogation is limited in scope as to what property is covered." Id. at 672. We explained:

> [T]he construction contract provides that the scope of the waiver of subrogation is limited to the work performed under the contract. Specifically, the construction contract requires the Owner to purchase insurance "for the entire Work." The construction contract defines "Work" to mean "the construction and services required by the Contract Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Contractor to fulfill the Contractor's obligations. The Work may constitute the whole or part of the Project." By definition, "Work" does not include the contents that were placed in the building after it was completed. Further, the waiver of subrogation applies to damage caused by perils insured against by the "property insurance obtained pursuant to this Paragraph 11.3 or other

10

property insurance applicable to the Work . . . ." Accordingly, the scope of the waiver of subrogation is limited to the value of the Work performed under the contract, i.e., the building addition. Because the contents are not part of the Work or completed building addition and because there was no requirement to waive subrogation rights as to property damage to property other than the Work, we hold that the waiver of subrogation does not bar recovery for damage to the contents of the building.

Id. at 672-73 (citations omitted). Thus, we permitted the insurer to attempt to recover from the contractor the $44,971.21 it paid to the property owner for the contents of the building.[3]

After careful consideration, we conclude that this case is in line with Midwestern and cases from other jurisdictions that we cited in support of our holding, including Town of Silverton v. Phoenix Heat Source Systems, Inc., 948 P.2d 9 (Colo. Ct. App. 1997), and S.S.D.W. Co. v. Brisk Waterproofing Co., Inc., 556 N.E.2d 1097 (N.Y. 1990).[4] To be clear, the Library is alleging that the diesel fuel leak spread beyond the strict confines of the library construction project and seeped into the surrounding land, and that the Library

---

[3] In so holding, we acknowledged the existence of contrary authority holding that the standard AIA waiver of subrogation provision precludes recovery by a property owner against a contractor anytime the property owner is reimbursed by insurance for a loss, regardless of whether the contractor damaged "Work" or "non-Work" property. See Lloyd's Underwriters v. Craig & Rush, Inc., 32 Cal. Rptr. 2d 144 (Cal. Ct. App. 1994). We declined to follow this authority in Midwestern and we see no reason to second-guess that decision.

[4] In resolving this case, we have deemed it unnecessary to address the Library's argument that it was under no obligation to purchase pollution cleanup insurance coverage. Our analysis regarding Section 11.3.7 and the scope of "the Work" would be the same regardless of whether the Library was required to purchase such coverage. We also need not address the Library's argument regarding a supplementary condition added to the AIA contract regarding indemnification of it by the Defendants for claims related to hazardous materials cleanup, which the Defendants argue is only a "third party" indemnification provision that does not permit direct "first party" recovery by the Library from the Defendants for such cleanup. See Flaherty & Collins, Inc. v. BBR-Vision I, L.P., 990 N.E.2d 958, 967 (Ind. Ct. App. 2013).

has incurred and will continue to incur significant costs associated with remediating that seepage from the land. The Library was only required by Section 11.3.1 of the AIA contract to cover the cost of "the entire Work at the site on a replacement cost basis," just as in Midwestern. The definition of "the Work" likewise is identical to the definition in Midwestern—"the construction and services required by the Contract . . . ." App. at 315. This evidences an intent that the Library was under no obligation to procure insurance for damage to property surrounding the jobsite or to property outside of the building project itself. Such damages could well exceed and be completely unrelated to the total replacement cost of "the Work." As such, the waiver of subrogation provision in Section 11.3.7 does not apply to damaged, contaminated land outside of "the Work"—i.e., the library building addition and renovation.

The trial court stated and the Defendants argue that the leakage of diesel fuel into land surrounding the library merely represented "consequential damages" flowing from a mishap related to "the Work." However, the same could have been just as easily said with respect to the damaged contents of the factory in Midwestern, which we held were not subject to the waiver of subrogation clause. Nor did the fact that the factory owner in Midwestern had procured insurance coverage for the contents of the building have any impact upon the effect of the waiver of subrogation clause.

We also reject the Defendants' attempt to argue that, as interpreted by Midwestern, the waiver of subrogation clause would only permit the Library to seek recovery for any loss of the contents of the fuel tanks. The Defendants' reading of

12

Midwestern is too narrow.  Although the contents of a building was the particular loss at issue in that case, the language of the opinion is clear that under Section 11.3.7 of the standard AIA construction contract, "there [is] no requirement to waive subrogation rights as to property damage to property other than the Work . . . ."  Midwestern, 801 N.E.2d at 673.  Our holding was not limited just to damages to the contents of a building, but any property outside the scope of "the Work."

We also note that in Town of Silverton, a faulty snow melting system that was installed as part of a new roof construction for a town hall was alleged to have caused a fire that damaged not only the new roof, but other parts of the town hall as well.  The Colorado Court of Appeals held, "the scope of the waiver of subrogation [under section 11.3.7 of the AIA form contract] is limited to the value of the work performed under the contract, i.e., the new roof, and is inapplicable to other parts of the town hall damaged in the fire."  Town of Silverton, 948 P.2d at 12.  These facts are even more similar to the present case than those in Midwestern, in that they concern damage to property immediately surrounding "the Work" and not the contents of a building.  As we found Town of Silverton persuasive in Midwestern, we do likewise here.

Finally, we find additional guidance in S.S.D.W. Co.  In that case, an apartment building owner alleged that a contractor who was hired to do some corrective work caused a fire that caused extensive damage not only to parts of the building covered by the contract but to other areas as well.  The Court of Appeals of New York held that under the standard AIA insurance and waiver of subrogation provisions—again, virtually

13

identical to the provisions here (though differently numbered)—the waiver of subrogation provision did not preclude the apartment building owner or its insurer from seeking recovery from the contractor for damages to the building that went beyond the parts of the building covered by "the Work." S.S.D.W., 556 N.E.2d at 1100-01. Among other parts of its analysis, the court observed that, while the apartment building owner was required by the contract to procure insurance covering "the Work," the contractor was obligated to procure insurance "covering whatever property damage it may cause other than to the Work itself." Id. at 1099. The court stated that if it permitted the contractor—and its liability insurer—to escape liability for damages it caused beyond the scope of the "the Work," it would upset the balancing of insurance responsibilities set forth by the contract, effectively transforming the property owner's insurer into the insurer of the contractor. The court found such a construction to be inconsistent "with either the natural and obvious meaning" of the contract's insurance provisions "or with what seems to be the over-all sense of the arrangement" of those provisions. Id. at 1100.

We find this reasoning persuasive as well. As in S.S.D.W., under the standard AIA contract, the Defendants were required under Section 11.1.1 to procure liability insurance that would provide coverage for damage to property "other than to the Work itself . . . ." App. p. 316. In other words, we believe the AIA standard contract generally divides responsibility for providing insurance as follows: the project owner is required to provide insurance covering any mishaps that cause harm to "the Work" itself, while contractors are required to provide insurance covering mishaps that cause harm outside of

14

"the Work." Moreover, a project owner cannot seek reimbursement from a contractor for any mishaps resulting in harm to the project itself, because it was obligated to purchase insurance for such mishaps. However, a project owner can seek recovery from a contractor (or its insurer) for construction mishaps resulting in harm to non-construction work property, consistent with the contractor's obligation to purchase liability insurance to cover those kind of mishaps. For this reason, we are unmoved by the Defendants' argument that they were unaware that the Library had only procured $5,000 worth of insurance coverage for pollution cleanup, suggesting that they might have procured additional pollution cleanup insurance under Section 11.3.1.2 of the AIA contract if they had known the Library had procured such a small amount of coverage. This is because the Defendants already clearly were obligated under Section 11.1.1 to purchase liability insurance for harm to property outside the scope of "the Work" and they could have planned accordingly.

## Conclusion

Consistent with our holding in Midwestern, we conclude that the Library is not precluded by Section 11.3.7 of the standard AIA contract from seeking recovery for pollution cleanup costs for property contaminated by the Defendants' allegedly faulty construction that is outside the scope of "the Work" for which the Defendants were contracted to perform. Namely, the Defendants may be required to reimburse the Library for cleanup costs of the land outside of the library building itself. We reverse the grant of

15

summary judgment to the Defendants and remand for further proceedings consistent with this opinion.

Reversed and remanded.

CRONE, J., and PYLE, J., concur.