In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 13-1502 & 13-1503

DAVID LAWSON,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

SUN MICROSYSTEMS, INC.,

*Defendant-Appellant/*
*Cross-Appellee.*

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:07-cv-00196-RLY-MJD — **Richard L. Young**, *Chief Judge*.

ARGUED JANUARY 9, 2014 — DECIDED JUNE 30, 2015

Before MANION and SYKES, *Circuit Judges*, and GRIESBACH,
*District Judge*.[*]

---

[*] Of the Eastern District of Wisconsin, sitting by designation.

SYKES, *Circuit Judge*. David Lawson sold computer mainte-
nance and support services for StorageTek, Inc., mostly to large
corporations. He was paid a base salary and commissions on
his sales under an annual incentive plan promulgated by the
company. Sun Microsystems, Inc., acquired StorageTek in
August 2005. At the time Lawson was working on a large sale
to JPMorgan Chase & Co., but the deal did not close until
March 2006. If StorageTek's 2005 incentive plan applied,
Lawson would earn a seven-figure commission, perhaps as
high as $1.8 million. If instead the sale fell under Sun's 2006
incentive plan, his commission would be far less—about
$54,000. Sun determined that the 2006 plan applied and
tendered the lower commission. Lawson refused it and sued
for breach of contract and violation of Indiana's Wage Claim
Statute. He argued that the 2005 plan continued in effect
through at least March 2006, when the JPMorgan Chase deal
was finalized.

The district court rejected the statutory wage claim but
submitted the contract claim to a jury, which found in favor of
Lawson and awarded $1.5 million in damages. Sun appealed,
and Lawson cross-appealed to challenge the district court's
ruling on the statutory claim.

We reverse and remand with instructions to enter judgment
for Sun. The sale did not qualify for a commission under the
terms of the 2005 plan. Although the original plan documents
said the plan would remain in effect until superseded by a new
one, a September 2005 amendment set a definite termination
date for the plan year: December 25, 2005. To earn a commis-
sion under the 2005 plan, sales had to be final and invoiced by

that date. Because Lawson's sale wasn't finalized and invoiced until March 2006, Sun is entitled to judgment as a matter of law. This conclusion necessarily defeats the cross-appeal.

## I. Background

The parties' briefs are laden with inscrutable acronyms and sales jargon specific to StorageTek and Sun. We will simplify where possible, but some peculiar terms are unavoidable.

StorageTek was a technology company specializing in data storage. The company sold hardware and software used to back up and recover data stored on centralized servers. It also provided maintenance and support services for its products and similar products sold by third parties. Many of its customers were large corporations.

Lawson worked for StorageTek as a Services Sales Executive II. In that position he sold computer maintenance and support contracts to customers in a defined territory. At the time in question, he was paid a base salary of $75,000 plus commissions on his sales.

### A. StorageTek's Incentive Plan

Every year StorageTek issued three documents that defined Lawson's compensation for that year. The first, called a "Sales Executive Incentive Plan," explained the compensation plan's general terms and conditions, including the terms under which sales would qualify for commissions. The second document, the "Incentive Plan Administration Document" or "IPAD,"

explained how commissions would be calculated and also contained additional terms and conditions applicable to StorageTek's North America sales territory. Finally, the "Quota Document" detailed Lawson's individualized sales goals and expected commissions.

The first of these documents incorporated the other two by reference, so together the three documents constituted Lawson's entire compensation agreement. The documents specified that Lawson's employment was at will. We'll refer to the plan documents collectively as the "incentive plan" (or just the "plan") unless the context requires otherwise.

As a general matter, StorageTek's incentive plan imposed three basic requirements for a sale to qualify for a commission: (1) the sale must be for "Enterprise Support Services" or "Remote Managed Services"; (2) the contract must meet StorageTek's revenue recognition standards; and (3) the sale must be final and the customer invoiced for the transaction. The sale at issue here initially pertained to Enterprise Support Services, a term with its own technical meaning. With some exceptions, these were contracts to support third-party (not StorageTek's) software and equipment.

This litigation concerns the 2005 incentive plan. To receive commission credit for new business under the terms of that plan, a new contract had to be executed and invoiced during StorageTek's 2005 fiscal year, which was calendar year 2005. The plan also awarded commissions for contracts executed *before* calendar 2005 but invoiced on "January 1, or later in 2005."

Renewal business was treated differently under the plan. StorageTek did not compensate renewed contracts as generously as new contracts. The company parceled out its existing service contracts between its sales executives by territory. Sales executives could claim commissions for renewals of the contracts assigned to them in their annual incentive plans.

If a sales executive thought a certain sale deserved special treatment, the executive could file a written request with the company's North America Incentive Plan Committee, with copies to local management. The committee would review the request and notify the sales executive of its decision.

StorageTek's 2005 incentive plan closed with this section, the meaning of which is central to this case:

> This Plan is effective as of January 1, 2005, regardless of the specific date of publication or distribution, and supersedes all prior Plans, provisions, precedents, compensation arrangements, memoranda and incentive programs. *It will remain in effect until a subsequent plan, or amendment to the Plan, becomes effective.* All sales eligible for quota credit under this Plan, or any amendment, by the end of the fiscal year 2005 will be payable under this Plan. Sales not eligible will be payable under the Plan in effect at the time quota credit is earned. *Incentives are not earned and are not wages until all requirements under this Plan, the Quota Document, the IPAD* [*the Administrative Document*] *and any amendments to*

> *these documents have been met as determined solely*
> *by the Plan Administrator*.

(Emphases added.)

### B. Pursuit of JPMorgan Chase; the Sun Acquisition

Lawson started pursuing JPMorgan Chase as a customer in 2004, and by 2005 he was dedicating a significant amount of time to closing a deal. In June 2005 JPMorgan Chase solicited a bid from StorageTek for computer maintenance services. Although the parties had a preexisting contractual relationship to service StorageTek products, the June 2005 Request for Proposal involved computer maintenance services for non-StorageTek products, so this was new business unrelated to the prior contract. In other words, in StorageTek's sales taxonomy, JPMorgan Chase's Request for Proposal sought "Enterprise Support Services." Lawson spearheaded StorageTek's response.

Importantly, however, a large percentage of the new services contained within the Request for Proposal involved servicing Sun's products. Prior to Sun's acquisition of StorageTek in August 2005, IBM had subcontracted with Sun to provide JPMorgan Chase with global support for Sun products. This agreement, called a "Statement of Work," originally covered the period between February 1, 2003, and January 31, 2006. Sun and IBM extended the arrangement through December 31, 2009, pursuant to an amendment to the Statement of Work executed on March 15, 2005. Despite this extension, in June 2005 JPMorgan Chase issued a separate

Request for Proposal inviting Sun to bid directly (not through IBM) for the business covered by the Statement of Work. Jim Whaley, a Sun sales executive, took the lead in coordinating the response and submitted a bid on Sun's behalf.

On June 2, 2005, Sun announced that it was acquiring StorageTek. This announcement prompted Lawson to e-mail his supervisor, Paul Heidkamp, to ask how the acquisition would affect his commission on the JPMorgan Chase deal. Heidkamp responded that he needed more information and would get back to him. On August 31 Sun acquired StorageTek.

After the acquisition JPMorgan Chase asked Sun to combine the StorageTek and Sun bids. From the standpoint of Lawson's commission, the takeover dramatically changed the significance of the deal. As we've noted, a substantial portion of the JPMorgan Chase work involved maintaining Sun products—business that would have been new to StorageTek. After the acquisition, however, it was classified as renewal business because Sun was already providing the services under the IBM Statement of Work.

Sun's revised merged bid contained three components. First, Sun offered to combine and continue services it was already providing under the IBM Statement of Work and StorageTek's prior contract with JPMorgan Chase. Second, Sun offered to partner with UNISYS to service products made by other computer manufacturers, such as Hewlett Packard, Compaq, Dell, and IBM; this work would be new business for Sun. Third, Sun offered to provide maintenance services for JPMorgan Chase's mainframe computer systems.

Whaley (from Sun) and Lawson (from StorageTek) spearheaded the joint proposal, which Sun submitted to JPMorgan Chase on October 11, 2005. Whaley died shortly thereafter, and Martina Caldara, who had worked on Sun's pre-merger bid, filled his position.

In addition to changing the significance of the JPMorgan Chase deal, Sun's takeover of StorageTek altered the terms of Lawson's incentive plan. On September 1, 2005, Sun amended the plan to specifically address the effect of the acquisition. Whereas StorageTek used the calendar year as its fiscal year, Sun's fiscal year began on June 26. The September 1 amendment explained that StorageTek would convert to Sun's fiscal year, with the transition to take place on December 25, the end of Sun's second fiscal quarter. To effectuate the conversion, the amendment specifically stated that "the current incentive plan year for StorageTek will end December 25, 2005."

Sun continued to pursue the JPMorgan Chase deal through the fall of 2005, and Lawson again tried to ascertain how the acquisition would affect his incentive compensation. In November 2005 he e-mailed Woody Wall, a Sun manager, asking about the split between his commission and Whaley's. Wall assured Lawson that the company would "do the right thing for this transaction" and asked him to explain his concerns.

The day after this exchange, Peter Orr, who had been Whaley's supervisor, e-mailed Tom Kelley, Sun's Vice President of North American sales, explaining that Lawson's situation was "unique" and attempting to determine how his commission on the JPMorgan Chase deal should be treated.

Lawson received a copy of the e-mail but does not recall receiving any response.

On December 8 Lawson again e-mailed Heidkamp asking whether the 2005 compensation plan would extend beyond the new year or if a new plan would be forthcoming. Heidkamp responded that the "comp plan should stay the same." Heidkamp also e-mailed Phil Auble, Sun's Incentive Plan Administrator, asking for a special "exception" for Lawson's commission on the JPMorgan Chase sale. Additional exchanges between Lawson, Heidkamp, and other Sun supervisors throughout the month of December did not reach a consensus on how Lawson would be compensated for his work on the deal.

Sun's second fiscal quarter ended on December 25. The next day Sun sent Lawson a letter informing him that "[a]s of December 26, 2005, you will transition to [Sun's] Data Management Group Global Storage Sales Compensation Plan." The December 26 letter stated that Lawson would receive a copy of the plan and an individual goal sheet "[o]n or about January 15, 2006." The letter also assigned Lawson a new title: "Sales Specialist 1, DMG Sales." Lawson countersigned the letter, indicating that he received and understood it. Sun did not send him a copy of the new incentive plan until March 17, 2006.

In the meantime, the JPMorgan Chase deal remained in limbo. JPMorgan Chase continued to study Sun's October 11 bid and asked for a $7 million price reduction for the Sun/IBM component. On December 15, 2005, Lawson sent a detailed

e-mail to Sun management proposing a strategy for persuading JPMorgan Chase to accept the deal.

JPMorgan Chase ultimately accepted only the first part of Sun's October 11 bid—the component consisting of the joint Sun/IBM proposal and continuation of the services StorageTek had previously provided. JPMorgan Chase and IBM executed a "Letter of Authorization"—essentially an agreement to negotiate in good faith toward a final agreement or amendment of the Statement of Work by January 30, 2006. The final amendment wasn't issued until September 29, 2006, but in the interim the parties issued several letters of intent in which IBM agreed to continue to work under the amendment to the Statement of Work. Because JPMorgan Chase only accepted the first component of the bid, the deal did not result in new business to Sun or StorageTek. On March 16, 2006, Sun internally recorded the sale as final, and on March 23, 2006, issued the first invoices for the work.

## C. The Dispute Over Lawson's Commission

As the JPMorgan Chase sale was being finalized, Lawson continued to pursue his commission. On February 22 he requested a "max-draw" on his compensation—a request that the company front his anticipated commission. For the next several weeks, Sun management tried to determine the appropriate commission for the sale. Lawson argued that the JPMorgan Chase work should be classified as Enterprise Support Services under the 2005 StorageTek plan because that's what it was when he started pursuing the deal more than a year earlier. New contracts for Enterprise Support Services

received the highest percentage commission under the 2005 plan because they constitute new business to the company. With an agreed annual price of $21.2 million for the JPMorgan Chase's U.S. business and another $6.8 million for its world-wide business, Lawson's commission under the 2005 plan would exceed $1.8 million.[1]

While these discussions were ongoing, Sun paid Lawson $17,000 on his draw request, fully recoverable if the company later determined that the commission was not owed. Sun management ultimately rejected Lawson's request to treat the JPMorgan Chase deal as Enterprise Support Services under the 2005 plan. In light of the Sun/StorageTek merger, the sale was not new business, so the company concluded that the higher commission would be an improper windfall to Lawson. Sun said it would treat the sale as an assigned renewal contract under the 2006 plan, triggering a substantially lower commission.

On March 17 and again on March 23, Sun e-mailed Lawson a copy of the 2006 incentive plan (technically called the "Data Management Group Sales Compensation Plan"). The plan itself was dated March 13, 2006, and was retroactively effective to December 26, 2005. On April 4 Lawson received his goal sheet, which contained his individual sales targets for the year. Lawson refused to sign it, fearing that doing so would preju-dice his claim to a larger commission for the JPMorgan Chase

---

[1] This figure included a multiyear incentive, which could be awarded to a sales executive for securing contracts of two or more years. Without that incentive Lawson's commission would be about $1.5 million.

deal. On May 12 Sun e-mailed Lawson a revised goal sheet, which treated the JPMorgan Chase sale as an assigned renewal and awarded a commission of $54,300. Lawson declined it and refused to sign the goal sheet.

Lawson thereafter retained counsel and on June 2 made a final demand for a commission for the JPMorgan Chase sale under the terms of the 2005 StorageTek plan. Sun declined to pay the demand. In October 2006 Lawson was laid off in a reduction in force.

### D. Litigation History

Lawson sued Sun in Indiana state court alleging claims for breach of contract, quantum meruit, and violation of the Indiana Wage Claims Statute, IND. CODE §§ 22-2-9-1 *et seq.* (authorizing recovery of penalty damages and attorney's fees). Sun removed the case to federal court, *see* 28 U.S.C. §§ 1332(a), 1441(a), and filed a counterclaim alleging that Lawson violated the Illinois and California eavesdropping statutes by secretly recording several telephone conversations with Sun employees during the dispute over the commission.

Sun moved for summary judgment, and the district court granted the motion in part. The judge held that relief under quantum meruit was barred because the parties had an express contract. The judge also held that the eavesdropping counter-claim could not proceed because Indiana law applied (not the law of Illinois or California). Neither side challenges these rulings, so we'll say no more about them. The judge denied summary judgment on the contract and statutory wage claims,

finding the plan documents ambiguous and a trial necessary to determine liability.

The case was tried to a jury, which found Sun liable for breach of contract and awarded $1.5 million in damages. On the statutory claim, however, the judge changed his mind and entered judgment for Sun as a matter of law, *see* FED. R. CIV. P. 50(a), holding that Lawson's commissions were not "wages" under the Indiana statute. The judge rejected Sun's Rule 50(b) motion for judgment as a matter of law on the contract claim and entered final judgment on the jury's verdict. Both sides appealed.

## II. Discussion

Sun argues that Lawson's contract claim fails as a matter of law because the 2005 incentive plan expired on December 25, 2005, and the JPMorgan Chase sale was not finalized and invoiced until March 2006. Lawson counters that the plan documents are ambiguous and the evidence at trial was sufficient for a reasonable jury to conclude that Sun intended the 2005 plan to remain in effect through at least March 2006. In his cross-appeal Lawson challenges the district court's ruling on his statutory claim for unpaid wages.

We review the district court's Rule 50(b) rulings de novo. *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 613 (7th Cir. 2013). Judgment as a matter of law is proper if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1); *see also May v.*

*Chrysler Grp., LLC*, 716 F.3d 963, 970 (7th Cir. 2012). The parties agree that Indiana law applies.

**A. Waiver**

As a preliminary matter, Lawson argues that Sun waived its primary legal argument about the interpretation of the 2005 plan by failing to raise it at trial in a motion for judgment as a matter of law under Rule 50(a) or in a posttrial motion under Rule 50(b). We disagree.

At the summary-judgment stage, Sun specifically argued that the 2006 incentive plan—not the 2005 plan—controlled as a matter of law. The district court found the plan documents ambiguous and allowed the contract claim to proceed to trial. Sun's argument about the proper interpretation of the plan is more elaborate on appeal than it was in the district court, but no rule prohibits appellate amplification of a properly pre-served issue. *See Yee v. Escondido*, 503 U.S. 519, 534 (1992) ("Once a … claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.").

Nor was Sun required to renew all the legal arguments it made at the summary-judgment phase when challenging the sufficiency of the trial evidence under Rule 50(a) and Rule 50(b). As a general matter, we do not review a decision denying summary judgment once the case has proceeded to trial; summary judgment relies on evidentiary predictions, which are unnecessary once a jury has found the actual facts. *Chemetall GmbH v. ZR Energy, Inc.*, 320 F.3d 714, 718 (7th Cir.

2003). And although a Rule 50 motion ordinarily is required to preserve a challenge to the sufficiency of the trial evidence, *id.* at 718–19, questions of contract interpretation are different. They involve pure questions of law unrelated to the sufficiency of the trial evidence, so it's not necessary for summary-judgment losers to relitigate purely legal issues of contract interpretation in a motion under Rule 50(a) or (b).[2] *Id.* at 718–20.

Sun's principal argument on appeal raises a purely legal question of contract interpretation: Based on the language of the plan documents, does StorageTek's 2005 incentive plan apply to the JPMorgan Chase sale? Sun preserved this issue at the summary-judgment stage. And because it has no bearing on the sufficiency of the trial evidence, Sun did not need to raise it again in its Rule 50(a) and (b) motions. The argument was not waived.

### B. The 2005 Incentive Plan Does Not Apply

Under Indiana law "[t]he unambiguous language of a contract is conclusive upon the parties to the contract and upon

---

[2] There's a split of authority on this point, as we noted in *Chemetall GmbH v. ZR Energy, Inc.* 320 F.3d 714, 719 (7th Cir. 2003) (citing *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Corp.*, 51 F.3d 1229, 1239 (4th Cir. 1995)); *see also Ji v. Bose Corp.*, 626 F.3d 116, 127–28 (1st Cir. 2010) (refusing to recognize an exception for purely legal claims). The Supreme Court did not resolve the question in *Ortiz v. Jordan*. 131 S. Ct. 884, 892 (2011) (refusing to address whether a qualified-immunity defense based purely on a legal question needed to be renewed in a posttrial Rule 50 motion).

the courts." *Whitaker v. Brunner*, 814 N.E.2d 288, 293 (Ind. Ct. App. 2004) (quotation marks omitted). Extrinsic evidence of the parties' intent is permitted only when the contract is ambiguous or uncertain in its terms, in which case the question of the parties' intent is one for the fact finder. *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 212 (Ind. Ct. App. 2007). But "[i]f the contract language is clear and unambiguous, the document is interpreted as a matter of law without looking to extrinsic evidence." *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 359 (7th Cir. 2009) (Indiana law). "A contract is not ambiguous merely because the parties disagree as to its proper construction; rather, a contract will be found to be ambiguous only if reasonable persons would differ as to the meaning of its terms." *Allen Cnty. Pub. Library v. Shambaugh & Son, L.P.*, 997 N.E.2d 48, 52 (Ind. Ct. App. 2013) (quoting *Vincennes Univ. v. Sparks*, 988 N.E.2d 1160, 1165 (Ind. Ct. App. 2013)).

The relevant language in the 2005 incentive plan is not ambiguous. As amended on September 1, 2005, the plan fixed a clear and definite expiration date for the plan year: December 25, 2005. More specifically, the September 1 amendment stated that "StorageTek has adopted Sun's fiscal calendar for incentive compensation purposes. Sun's … second fiscal quarter (Q2) ends December 25, 2005. Therefore, the current incentive plan year for StorageTek will end December 25, 2005."

Lawson resists the force of this explicit termination date by invoking the provision we have block-quoted above, which states (among other things) that the plan "will remain in effect

until a subsequent plan, or amendment to the Plan, becomes effective." In Lawson's view this provision conflicts with the fixed expiration date specified in the September 1 amendment, creating an internal ambiguity. The district court agreed, denied summary judgment, and allowed Lawson to present extrinsic evidence at trial bearing on Sun's intent that the plan continue beyond the termination date.

That was a mistake. Contractual phrases are not read in isolation; rather, the contract must be read as a whole. *Allen Cnty. Pub. Library*, 997 N.E.2d at 52. Moreover, Indiana courts prefer "an interpretation of the contract that harmonizes its provisions, as opposed to one that causes the provisions to conflict." *Four Seasons Mfg. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007). Read holistically and harmonized, these provisions are not in tension with each other.

As we've noted, Lawson's argument relies heavily on the concluding paragraph in the unamended 2005 plan, which we have quoted in full above. That paragraph contains the following key terms: (1) the 2005 incentive plan is exclusive, i.e., it's the only compensation plan in place for StorageTek's 2005 fiscal year; (2) the plan is effective January 1, 2005, even if published later; (3) the plan supersedes any previous plan and continues in effect until a subsequent plan or amendment becomes effective; and (4) the only sales eligible for commission credit under the 2005 plan are those meeting all plan requirements by the end of fiscal year 2005. The September 1 amendment substituted Sun's fiscal year for StorageTek's and fixed a definite termination date for StorageTek's then-current plan year: December 25, 2005.

Read together, these provisions unambiguously establish that to qualify for commission credit under StorageTek's 2005 plan, a sale must meet all eligibility requirements *by the end of the plan year*, that is, by December 25, 2005. The JPMorgan Chase sale plainly did not qualify.

Lawson proposes an alternative interpretation: Although the *plan year* ended on December 25, 2005 (by virtue of the language in the September 1 amendment), the *plan itself* continued in effect beyond that date until a new plan became effective. And because Sun did not transmit the 2006 plan to him until March 17—the day *after* Sun internally recognized the JPMorgan Chase deal as final (on March 16)—he is entitled to a commission under the 2005 plan.

There are several problems with this interpretation. First, the 2005 plan unequivocally states that "[a]ll sales eligible for quota credit under this Plan, or any amendment, *by the end of fiscal year 2005* will be payable under this Plan." (Emphasis added.) Another provision makes it clear that new contracts *must* be invoiced during the 2005 fiscal year to receive commission credit:

> *Both contract execution and initial invoicing must occur during the StorageTek Fiscal Year to count as Comp Revenue*, unless determined otherwise in StorageTek's sole discretion. If a contract is fully executed prior to January 1, 2005 and not invoiced until January 1, or later in 2005, it will count as Comp Revenue under this Plan.

(Emphasis added.)

Moreover, the 2005 plan is explicit that "[s]ales not eligible [under this plan] will be payable under the Plan in effect at the time quota credit is earned." This provision contemplates the likelihood that sales may be in progress in 2005 but not finalized and invoiced until later, and specifically provides that quota credit for these sales is awarded under the terms of the plan in effect when credit is earned—i.e., under a successor plan, *not* the 2005 plan. In other words, sales in progress but not yet invoiced when the 2005 plan year expires are *not* grandfathered into the 2005 plan. Finally, Sun's 2006 incentive plan, though dated and delivered to Lawson on March 17, 2006, was made fully retroactive to December 26, 2005.

If more were needed to demonstrate the flaws in Lawson's interpretation, the 2005 plan specifically required that sales executives submit all payment requests for 2005 commissions no later than 30 days after the close of the 2005 fiscal year. That requirement would be impossible to fulfill for sales still in progress and not yet invoiced when the fiscal year expired.

In short, Lawson's proposed interpretation cannot be reconciled with key plan requirements for commission eligibility. To the contrary, accepting Lawson's interpretation would require us to rewrite the most important terms of the compensation plan to make the JPMorgan Chase deal qualify for commission credit without fulfilling any of the requirements necessary to earn a commission under the 2005 plan. That, by definition, makes Lawson's proposed interpretation an unreasonable one. *See Hepburn v. Tri-Cnty. Bank*, 842 N.E.2d 378, 384 (Ind. Ct. App. 2006) (explaining that Indiana courts do not "add provisions to a contract that were not placed there by

the parties"); *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 669 (Ind. 1997) ("[T]he power to interpret contracts does not extend to changing their terms.").

In addition to these intratextual difficulties, the compensation plan as written is not readily amenable to judicial gap-filling. As we've explained, the plan treated new and renewal business differently. New business received the highest commission; renewal contracts received no commission unless specifically assigned to a sales executive as part of his revenue quota, and these commission rates were lower than for new business. If the 2005 plan continued beyond fiscal year 2005 and covered sales finalized and invoiced in 2006, vexing questions would arise about how to calculate commissions. Business might be considered new in 2005 (and therefore compensable at the highest rate) but not new in 2006, when the commission is actually earned. Commissions based on 2005 assigned renewals likewise could have a different status in 2006—including, for example, a reduced commission rate if the profitability of a deal declined over time. This interpretive difficulty bolsters our conclusion that Lawson's preferred reading of the plan is not a reasonable one.

The parties spill a lot of ink debating Lawson's status as an at-will employee; the meaning of Sun's December 26, 2005 letter; the effect of Lawson's refusal to sign his 2006 goal sheet (and revised goal sheet); and the parties' course of conduct in late 2005 and early 2006 as the negotiations over the disputed commission unfolded. Because the plan language is not ambiguous, this extrinsic evidence simply drops out of the case. The trial was unnecessary.

In sum, the JPMorgan Chase sale unambiguously did not qualify for a commission under the 2005 plan. And because Lawson was not entitled to a commission under the 2005 plan, his claim for unpaid wages under the Indiana Wage Claims Statute necessarily fails.

Accordingly, we REVERSE the district court's judgment and REMAND with instructions to enter judgment for Sun.